Good morning, Your Honor. My name is Lawrence Semenza, and I'm appearing on behalf of the appellant, Thomas Wells, and Interbill, Ltd. Like the previous case, this is an appeal from the granting of a summary judgment from the district court, and pursuant to the order of this court on Monday of this week, in which the court notified counsel that counsel appearing on behalf of the appellant and the appellee should be ready to discuss the knowledge issue in our case that was discussed in the case of FTC v. Navioni. The facts in that case, when I reviewed that opinion, I felt that I was in trouble in this case because of the factual basis. However, in reviewing the case of Niovi, I noticed that the district court's findings was that the appellant in that case, two checks, that the district court found a profound lack of diligence, coupled with the affirmative acts of creating and delivering of thousands of unverified checks, over 150,000 of which were from accounts later frozen for fraud, warranted liability under the FTC Act. There was no separate discussion in that opinion as to which factual basis or knowledge was relied upon. However, Judge Hawkins, you sat on that panel, and in that case, I believe that the factual allegations, the knowledge issue, which is the same issue that we have in our case, was set forth in the allegations of fraud that were outlined in the opinion. In that case, in the Niovi case, it was pointed out that the scheme itself, the two checks ability to have checks created, was vulnerable from con artists from the beginning, that as a result of putting these checks into commerce, Kewcheck received hundreds of letters and thousands of telephone calls from consumers, banks, law enforcement agencies, complaining about the funds drawing from accounts without authorization. Kewcheck also indicated that they were attuned to the risk of fraud from the beginning. Indeed, the president of the corporation said that they believed that there would be fraud involved in these activities and that they were going to attempt to monitor it. The most important factor, I believe, in this case is the fact that this scheme, this The opinion does mention certain items, certain attempted remedial measures were being utilized by the company, but they failed. And eventually, they were shut down and the FTC proceedings were brought. In this case, we cumulatively have a large number of customer complaints, not necessarily directed solely at your client, but among all the participants in this, that raise a number of red flags that the district court concluded a reasonable businessman would have clearly tipped them off to a fraudulent scheme here. I think that's correct, and I think Wells Fargo, and I think the E-Value check, and Interbill and Mr. Wells came to that same conclusion. Although, in this particular case, it's different, because the checks that are done, the ACH, and then are produced, sent to the banks for their cashment, encashment, is that generally the persons whose bank accounts those are don't necessarily see those account transactions until the bank statement's cut. That's why there was a delay or a lag in complaints, and then also, this was the case that was shut down within eight weeks, whether or not it was Wells Fargo who shut it down, who also had agreed to the transactions, whether it was E-Value check who shut it down, or whether it was Wells that shut it down. There was that indicia that they knew something was going on, and they attempted to monitor the transactions. When the complaints came in, whether it was by e-mail or phone, refunds were given to them. They were referred to the customer care center for the handling of the transactions, and Wells Fargo and or Mr. Wells and Interbill passed those checks back on the refunds. It is correct, isn't it, that Mr. Wells told Pearson that when the returns went over the 50 percent mark, that the whole thing smelled? That's correct. But continued to participate. Only for a short period of time. I believe also there's some testimony whether or not it was Wells Fargo that shut it down, whether Wells shut it down. Does that matter? Yes, it does, because they were all monitoring the transactions involved. Didn't you learn early on that Helmcrest was ceasing to do business with any customer who banked at Bank of America or Wells Fargo? No. I think it was at Bank of America, because the transactions, the number of transactions that were coming back from Bank of America were such that the returns were getting higher, and they the suggestion was, was to scrub those transactions, to take those transactions away, not to utilize Bank of America any longer because of whatever the reason was. And this all goes to a factual issue, whether or not that knowledge as such can be imputed to Mr. Wells and Interbil at that time. The due diligence, I mean, you go back to the beginning, and I mean in hindsight we can all look back on certain transactions that we've engaged in ourselves. Under NAOVI, the reason we asked you to be prepared on proof of actual knowledge is not required, is it? That's correct. And that was the only proof that's required is that the person facilitator contribute to ill-intentioned schemes where the result is predictable. And that's why it took my breath away when I read that opinion, because the knowledge issue here is still an important factor of knowing whether or not he engaged in this enterprise, whether or not they were all negligent in this enterprise. Isn't there some evidence that even late in the game, Wells was told there were problems but continued to participate because of the profit involved? There was some mention of the profit for the transactions. That's correct. But all of those transactions that would be – but you have to remember also that what Wells said was the fact that the control over this – and it's different than the acute checks where those persons were victims and had monies taken out of their accounts and were not reimbursed for those – was the fact that the reserves were being maintained, that they raised the reserve levels. That was also Interbil as well as Wells Fargo to ensure that individuals who had not ordered the product, who had not received the product, who wanted a refund from the product, that those funds would be there so that those funds could be repaid to them. If you have no further questions, I would like to reserve the remainder of my time. You may. Thank you. Good morning, Your Honors. May it please the Court. I'm Michelle Arrington representing the Federal Trade Commission in this action. I want to start with – just respond before I forget to one last thing that counsel for defendants said in this case. He suggests that this case is distinguishable from the Niovi case because while in this case, the victims, the consumers who had money taken from their accounts without their knowledge or authorization, well, they got their money back. Well, Your Honor, that is not the case. It is true that a number of consumers did, in fact, receive their money back when they complained, but there is also the record, and this is undisputed, that there are approximately $1.8 million worth of losses that have been incurred by consumers that have not been repaid. And it does not take into account the fact that there are a number of consumers who don't, on a regular basis or perhaps ever, check their accounts to see, you know, to reconcile their accounts or, in fact, may not realize that this amount that's been debited to their account has been taken out. So there is also in the record evidence that there are numerous consumers who tried to, in fact, get the money returned to them, not directly. They have the banks return the money to them, and they were unable to do so. So I just wanted to correct that point. Could you clarify one factual question I had? How did E-Value get the customer's victim's banking information? Your Honor, all of the banking information came from the pharmacy cards perpetrators here. And I've been How did they get it? From the customer? How did pharmacy cards get the? Your Honor, that is not on the record. Presumably, it was stolen. Nobody knows where that bank account information came from. Mr. Wells and his business, Interbill, certainly never asked in the initial discussions from the initial contact that he had with this man identifying himself for Steve Pearson, which, by the way, is very clear from the record. This whole thing came about because one day, Mr. Wells got a phone call from this man saying, hi, I'm Steve Pearson. I have this business. Here's what it is, and here's what I want to do. Sent him a few documents that showed nothing for direct mail, a business. Showed nothing about pharmacy cards or a business that related to pharmacy cards. Told him, I'm going to be doing this by direct mail. The way that it's going to work is consumers' accounts will be debited unless they opt out or they say they don't want to get this, which up front, and this is something that troubled this court tremendously as the first large red flag, among many others. And Mr. Wells did not ask that question, which would seem to be the first question that would occur to anyone, even a layperson, if you're going to be sending bank account numbers that I'm supposed to be collecting these funds, debiting the accounts and collecting these funds and then sending this money on to you. Well, if these accounts are going to be debited in the absence of an affirmative agreement by the, by these, you know, by individuals, where are you getting those account numbers from? And that's not in the record. We presume it's stolen, but Mr. Wells certainly did not ask that very pertinent question. There was, from the very beginning, as the district court noted, and the district court discussed this at some length in the summary judgment hearing, and that's on the record. The transcript of that is electronically on the docket. He did not have any business address, any physical location for this pharmacy card business. He did not have any documents that related at all to the, to the on, any ongoing or prospective pharmacy card business. He got some papers that had nothing to do with any direct mail marketing of a discount pharmacy card. All of the communications that were made with, by Mr. Pearson and any of the pharmacy card perpetrators were by anonymous, non-commercial email accounts, cell phone, untraceable cell phones. All of these together, and all of this, all of this together led Mr. Wells to project that there would be approximately a 20 to 30 percent return rate. And that's just at the beginning, almost a third that he expected of these, of these debits would be bounced back for whatever reason, for fraud, for problems with the accounts, which are, which are typical markers of fraud when you have that high a rate, and, and this is not just something that's shown in case law, in analogous cases of ACH, which is, which is through checking, but it's pure electronic. There is no paper deposit. But, you know, all of these are indicia of fraud if, if it exceeds 2.5 percent. And under NAOBI, how much knowledge and to what aspect of the scheme is that knowledge required? Well, Your Honor, in the NAOBI case, this Court made it clear there are several parts of that case, and knowledge is certainly one of the parts of the case that, of that case that applies here. The district court made it clear that, that actual knowledge of the harm to consumers of the fraud that's going to occur are not a requirement under the FTC Act. And that, that consumers will be injured for purposes of the Act, and, and we can get remedy, not solely through the machinations of those with ill intentions, but also through the actions of those whose practices facilitate or contribute to ill intentions. Did Mr. Welch have to know that he was facilitating the ill intention scheme? What he certainly had to know is that even, that there was a high probability going in, knowing that there was going to be this business, this, this business model of debiting consumer accounts in the absence of their affirmative agreement and projecting 20 to 30 percent return rates, which almost always is high probability the standard on knowledge. Well, I think this We're on summary judgment here also. I mean, that sounds like it might be, have some fact component to it. Well, Your Honor, in, in some circumstances, there might be a factual component here, a factual component. There, there may be disputed issues of material fact. As the district court made clear, and, and, and he indicated at the summary judgment hearing that, that if the defendants had come forward with any disputed facts, he, he might be loathe to grant summary judgment here. But in fact, as their counsel admitted at the summary judgment hearing, no, Your Honor, we don't have, we don't have any other declarant, any other competing, competing facts to allege to you, to report to you. We don't have any other documents. In fact, in opposing summary judgment, they cited to the very same documents and testimony that the Commission relied on, which was largely the testimony of Mr. Deposition, testimony of Mr. Wells himself, as well as the documents that Mr. Wells provided, which showed the email correspondence with, with Steve Pearson of Pharmacy Cards, the consumer complaints that he got, all reflecting, again, since it was not just the information that he had or what he should have known going into this. It was that, that almost immediately after this debiting of accounts started, he started getting consumer complaints of people. And, and these emails are in the record. The emails show subject matter, fraud, subject matter, you know, what is Pharmacy Cards? I've never heard of them. Where, why is this money being taken out of my accounts? He had that, he had the skyrocketing return rates, which went from, quickly exceeded 30 percent, went to 40 percent, went to 50 percent. By the end of the, the, towards the end, it was 60 percent. And I actually, when, in going back over the record, this is, again, at every step of the way, Mr. Wells had an opportunity to, to put a halt to this and say, and say, well, let me see what's going on, because something's clearly wrong here. Did he do that? At any point of the, of this way, he could have done that, and he did not. Do you think he, do you think he knew enough before the first bank account was debited? Your Honor, I think that based on what we knew, what, what the record clearly shows, and he does not dispute objectively, he knew going in, what he knew going in objectively, as the district court said in, at the hearing, objectively, that was, those were enough red flags that objectively he should have known that there was a high, that, that this was a, if not a fraudulent enterprise, there was a likelihood of, of fraud. So that from the beginning, that was enough. But to the extent there was any doubt, any room for doubt in what he knew going in, given that almost immediately after the debiting began, the complaints started pouring in, the return rates started skyrocketing, that, that there's no room for doubt. And, and, and if, if Mr. Wells says that he did not, in fact, know, then he was turning, then he was putting some serious blinders on. And, and the district court found that that was the case, and found that, that, that given the fact that there was no countervailing testimony, but that, that they, that defendants had to offer or were prepared to offer, and in fact admitted at the summary judgment hearing that they would just like to put Mr. Wells on again to excuse his conduct, but that there was no, no different facts that were going to be brought to light. And, and the, the district court quite, quite correctly said, then there's no issue of fact for summary, you know, to preclude. There's no, there's no, there's no issue of fact that needs to be tried here, and summary judgment is appropriate. Could I ask you to address on the remedy side, my understanding is that some of the Wells Fargo Bank got something like half a million dollars in revenue from this by virtue of what interest that they charged or whatever, that, that half a million dollars was included in the total losses that have been, for which the defendants have been held responsible. Can you address, address that? I'm not certain of what the precise amount was. It is true that, that the FTC does not have jurisdiction over banks. And so, so if we had had jurisdiction, the ability to go in and, and, and get that money back directly from Wells Fargo, then I'm certain that the commission would have done so, but, but the FTC does not have jurisdiction. That's a component of the damage, the total loss that has been awarded against these defendants. Any amount that the FTC was not able to collect from other sources, and the, the commission brought an action against the pharmacy card defendants directly, although they, they, they flew the coop, but we were able to get, we were able to get an order where we could go to third parties, and we did collect some money that were being held on behalf of those defendants by third parties. We collected every amount that we could, but yes, to the extent that, that we were able to do so, there's no dispute about what the amount was. All that amount was subtracted out. We're left with approximately $1.8 million. If we were able to collect it from Wells Fargo, we would have done so, but we were not able to. Okay. Now, do the defendants have the ability to seek any kind of relief from Wells Fargo? Well, I, to be honest, I am not sure they weren't able to do it through this action by way of, of contribution by, by, by filing a third party complaint. Is that because the FTC doesn't have jurisdiction over the bank, or why was it? My understanding is that, that, that it's not if, unless the government specifically authorizes it under, you know, under the, the relevant statute authorizes contribution, that, that is not, that, that is not allowed. They did not, and, and, and, and my understanding is that that's why the district court granted Wells Fargo's motion to, to dismiss the third party complaint, they haven't challenged that, but so I don't, I don't know independent of that what, what, what recourse they may have, but, but Your Honor, this, the Ninth Circuit has made it clear that, that, that restitution and, and restitution is not limited, yes. We understand that. All right. I'm just asking a specific question. Sure. Any further questions? All right. Thank you, Your Honor. Thank you. I think the major factor here is, is that, again, going back to, hindsight is great. You can look back and say, yes, should have known, would have known, could have known, but didn't. And the fact is that. Should have known is enough, isn't it? Should have had suspicion. Should have known is enough. Should have known is enough in hindsight. And that's, that's what that in the OBK says. Hindsight, you can look back, but in that case, you had six years to look back, not two months, not eight weeks, not ten weeks. You had six years to look back and say, this is really, really, really, really bad, and therefore, we're going to hold them responsible for it. Can you point to any time in the timeline of your client's involvement in this when he did anything to discover what was really going on? Only towards the end. He had asked for verification, and that wasn't towards the end. It was, I would believe, approximately a month into the transactions. He wanted verification that the pharmacy card packets were indeed being sent to those persons who had been purchasing them. And was he provided with that information? He was not provided with that information. He didn't do. And he didn't follow up on it. And that's his mistake for not following up on it, and that's probably why he's where he is today in this circumstance. The fact of the matter is, is that even using your standards should have. Not my standards.  No, but the standard that's been enunciated by the Court. There's not much you can do under those circumstances. But the fact of the matter is, is they look back in this hindsight and say, what you did, we're not saying we really don't care if it was reasonable or not, what you did. It's just that, obviously, it went bad, and therefore, under the circumstances, you're responsible for the loss. The fact of the matter is also, and you've mentioned about Wells Fargo, banks as such are not regulated by the Federal Trade Commission. So even though the bank, in this case, engaged in the transaction, utilized what due diligence they did under the transaction, in conjunction with Mr. Wells and Interbil, they're not responsible for the fact that they made off with a half a million dollars in fees. They made it on both ways. When the transaction came in, they received a fee, and when they refunded the transaction, they also received a fee for it. I thank you very much. Thank you. The case is submitted, and we will stand in adjournment. And for the folks in the audience with whom the judges are going to meet, we'll do that after our conference. Thank you.
judges: Tymkovich, Hawkins, Fisher